19 CVS 4558

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
COUNTY OF NEW HANOVER      FILE NO:

**EXHIBIT 1**

| | |
|---|---|
| RAJ HOSPITALITY, LLC, a Delaware limited liability company, registered and authorized to do business in North Carolina as *"Wilmington Comfort Suites, LLC"* and *"Comfort Suites,"*<br><br>    Plaintiff,<br><br>vs.<br><br>PALOMAR INSURANCE HOLDINGS, INC., a Delaware corporation; and PALOMAR SPECIALTY INSURANCE COMPANY, an Oregon corporation and insurance company and wholly owned operating subsidiary of PALOMAR INSURANCE HOLDINGS, INC,<br><br>    Defendants. | COMPLAINT FOR DAMAGES<br><br>Sounding in:<br><br>(1) *Breach of Contract of Insurance*;<br>(2) *Bad Faith*; and<br>(3) *Unfair Trade Practices*<br><br>and seeking Declaratory Relief, pursuant to Rule 57 of the North Carolina Rules of Civil Procedure, *et seq.*<br><br>(Jury Trial Demanded)<br><br>A TRUE COPY<br>CLERK OF SUPERIOR COURT<br>NEW HANOVER COUNTY<br>BY: *Katherine Sigmon*<br>Deputy Clerk of Superior Court |

NOW COMES the Plaintiff, by and through its undersigned counsel of record, and – complaining of the Defendants – says and alleges as follows:

**PARTIES AND JURISDICTION:**

1. That the Plaintiff, Raj Hospitality, LLC (hereinafter, sometimes referred to as simply *"the INSURED/PLAINTIFF"* and/or *"Comfort Suites"*), is a limited liability company organized and existing under the laws of the State of Delaware, with its principal office in Wilmington, North Carolina, registered with the North Carolina Secretary of State as a foreign limited liability company and otherwise authorized to do business in North Carolina as *"Wilmington Comfort Suites, LLC"* and *"Comfort Suites."*

2. The Defendant, *Palomar Specialty Insurance Company*, is an insurance company and corporation organized and existing under the laws of the State of Oregon, with its principal

office in La Jolla, California, and is – and was, at all times relevant herein – licensed and admitted to solicit, sell and issue policies of property and other insurance and to otherwise transact business as a *fire and casualty insurance company* in some twenty-five (25) states of the United States of America, to specifically include the State of North Carolina (under its NAIC Number 20338); and the Defendant, *Palomar Insurance Holdings, Inc.,* is an insurance holding company and corporation organized and existing under the laws of the State of Delaware, also with its principal office in La Jolla, California, with *Palomar Specialty Insurance Company* as its wholly owned operating subsidiary.

3. *Palomar Specialty Insurance Company* is – by virtue of the aforesaid common ownership – so inextricably intertwined with *Palomar Insurance Holdings, Inc.,* as to be in no fashion "independent" from said holding company, but rather – as a wholly owned affiliate – in a *de facto,* bilateral principal/agent relationship with *Palomar Insurance Holdings, Inc.,* so that all contracts and other acts and omissions and policies and practices and all knowledge of *Palomar Specialty Insurance Company* are imputed to *Palomar Insurance Holdings, Inc.,* under a theory of *respondeat superior,* and likewise all acts and omissions and policies and practices and all knowledge of *Palomar Insurance Holdings, Inc.* are imputed to *Palomar Specialty Insurance Company*, and each is otherwise vicariously liable for all acts, omission, and other conduct of the other at issue herein (the aforesaid Defendants, *Palomar Specialty Insurance Company* and *Palomar Insurance Holdings, Inc.*, shall hence be hereinafter sometimes collectively referred to as simply "the INSURER/DEFENDANTS" and/or "*Palomar*").

4. In registering *Palomar Specialty Insurance Company* with the North Carolina Department of Insurance as an authorized and admitted *fire and casualty insurance company*, the INSURER/DEFENDANTS, *Palomar,* purposely availed themselves of and submitted themselves and the consequences of their contacts, contracts and other actions in North

2

Carolina to the laws and other benefits of the State of North Carolina and otherwise established and maintained – and still maintain – sufficient minimum contacts with the State of North Carolina to satisfy the North Carolina long-arm statute and other such due process requirements requisite to both being called to answer and otherwise be subject to the jurisdiction of North Carolina's State Courts with regard to property insurance policies (to include the contract of insurance at issue herein, as discussed more fully, *infra*) sold and/or otherwise issued by the INSURER/DEFENDANTS, *Palomar,* in the State of North Carolina.

5. This matter arises from insurance claims rightfully made by *Comfort Suites*, and wrongfully denied by *Palomar*, pertaining to *Comfort Suites'* hotel, in the City of Wilmington, in the County of New Hanover, in the State of North Carolina.

6. Hence, this Court has jurisdiction over the parties and the subject matter of this claim; and venue in New Hanover County is proper.

### FACTUAL ALLEGATIONS:

#### Summation:

7. As aforesaid, this matter arises from insurance claims made by *Comfort Suites* with *Palomar,* pertaining to their hotel (hereinafter, the "Subject Hotel") in Wilmington, North Carolina. The Subject Hotel and its contents – duly insured by *Comfort Suites* with *Palomar* (at all times relevant herein) – were damaged and destroyed by Hurricane Florence, occurring on and around September 14, 2018, which caused a catastrophic, hotel-wide *design performance failure* of each and all of its rooms' and myriad other exterior windows (due to sustained exposure to wind pressures near, at or exceeding the window units' structural design capability) during Hurricane Florence, with the resultant wind-created-openings (between the two windows of each window assembly) thereby causing

3

massive water-intrusion into, and resultant water damage to, the Subject Hotel's interior and contents.

8. A substantial amount of *Comfort Suites'* insurance claims for damages to their Subject Hotel (and its contents) arising from Hurricane Florence have been wrongfully denied by *Palomar*, with *Palomar* disputing the repair cost of such damages and/or relying upon a so-called "wind-driven-rain" policy sublimit of $100,000.00.

**Background:**

9. The above-referenced Subject Hotel is/was – prior to Hurricane Florence – a three-story, 73-unit hotel, located at 4721 Market Street in Wilmington, North Carolina.

**Insurance:**

10. At the time of Hurricane Florence, *Comfort Suites* had the Subject Hotel insured – as aforesaid – with *Palomar*.

11. The operative policy of insurance (hereinafter, the "Subject Policy" – a certified copy of which is appended hereto as "Exhibit A") was assigned the *Palomar* Policy Number PAR-18-0000973-00, and effective August 15, 2018 to August 15, 2019. The "BUILDING AND PERSONAL PROPERTY COVERAGE FORM" of the Subject Policy bears *Insurance Services Office, Inc.* ("ISO") form policy number CP 00 10 10 12, and includes and appends various endorsements and other attachments, to include a "WIND DRIVEN RAIN ENDORSEMENT," numbered PSIC-WDR.

**Hurricane Florence:**

12. As aforesaid, the Subject Hotel and its contents were severely damaged by Hurricane Florence, which occurred on and around September 14, 2018, with its severe winds causing a catastrophic, hotel-wide *design performance failure* of each and all of its guest rooms' and myriad other exterior windows (due to sustained exposure to wind pressures near or at or exceeding the window units' structural design capability), with the resultant wind-

4

created-openings (between the two windows of each window assembly) thereby causing massive water-intrusion into, and resultant water damage to, the Subject Hotel's interior and contents.

13. More specifically, *Comfort Suites'* retained mechanical engineer, Stephen E. Stone, PE (a nationally-preeminent forensic engineer in the fields of mechanical engineering and failure-analysis) concludes:

    - "The [Subject Hotel] experienced significant water damage as a result of exposure to Hurricane Florence. The manager on duty observed significant water ingress through the windows of the damaged rooms coincident with peak wind exposure as the storm passed... Discussion by phone with Ms. Beth Bratz, manager on duty during the storm, established the following significant information:

        - The loss structure was occupied by staff and residents during the loss. The structure had been secured in advance of the storm, and attempts were made during the storm to inspect for and minimize water damage where possible.

        - Water ingress was observed through multiple locations on the window units within the damaged rooms. In some instances, water was observed blowing in through the vertical gap created between the fixed and operating sashes of the horizontal sliding windows with wind driven bowing or deflection. In other instances, water was observed overflowing the interior edge of the stepped sill.

    - Discussion with Mr. Clint Avery, maintenance mechanic, 5 December 2018 established that there was not a history of reported window leakage prior to the loss associated with Hurricane Florence.

    - Review of available architectural drawings for the loss structure retained on site confirmed that the basic design wind velocity specified was 110 MPH.... Research of New Hanover County property records established that the loss structure was built in 2001. Research of the applicable building code at the time the loss structure was built established that the basic design wind velocity was 110 MPH.

    - Research of weather data for Wilmington NC available on line through the National Hurricane Center and weatherunderground.com established that the loss structure was exposed to approximate maximum sustained winds of 90 MPH, maximum gusts up to 105 MPH, and minimum ambient pressure of 954 milli-bar (13.84 PSI) during Hurricane Florence.

5

## FINDINGS

- Nondestructive inspection of the windows and loss structure on 2 and 5 December 2018 revealed the following significant findings and observations:

  - Unoccupied rooms were made available for inspection. Room numbers 111, 115, 302 and 305 were inspected on 2 December 2018. Room numbers 101, 305 and 308 were inspected on 5 December 2018.

  - Each room inspected contained two identical aluminum horizontal single slider windows, comprised of one fixed and one operating sash. Each sash contained a double-glazed insulated glass unit (IGU) retained within the frame by interior snap-on-type extruded vinyl glazing bead. The nominal overall width and height of the windows was measured to be 72 by 56 inches respectively. Significant identifiers observed on the windows were recorded as follows: "GA" embossed on the cover of the window lock mechanism, "ALI® ASTM E774 CLASS A GA-1 SG" embossed on the IGU aluminum spacer and " AAMA CERTIFICATION PROGRAM", "MFR: GA-1", "SERIES: 2800", "TYPE: HORIZ SLIDER" printed on the Quality Control & Testing sticker affixed to the surface of the upper interior frame of the fixed sash on several windows.

  - Varying degrees of water damage attributable to water leakage through the windows was observed within the rooms inspected. The more significant damage observed was comprised of visible staining and blistering of paint on the adjacent drywall, localized softening or degradation of drywall material, and staining and accumulation of debris within the sill operating track and weather seal near the bottom of the sash. The features and characteristics of the water damage patterns evident were visually consistent in appearance with water ingress and accumulation between the fixed and operating sash, overflowing the interior edge of the stepped sill.

  - The operable sash within each window inspected was lightly manipulated by hand to assess lateral and axial (perpendicular to track) movement for actuating force and excessive play respectively. The variations in lateral and axial movements observed were generally consistent with the accumulation in track debris and age of the windows respectively, with no significant anomalies relevant to the reported leakage observed.

  - Application of light hand pressure to the exterior surface of the

6

glazing/IOU of the windows inspected revealed significant variations in inward deflection. In the majority of cases, deflections were sufficient to overcome the effectiveness of the weather seal, creating physical clearance and the potential for water ingress. Inspection of the windows exhibiting the most significant deflections revealed that one or more of the interior snap- on-type extruded vinyl glazing beads retaining the panel within the sash were compromise d. The compromised glazing beads observed were partially dislodged from the vertical frame members in several windows, and completely missing from one window inspected. The compromised glazing beads observed were visually consistent in appearance with reaction of significant wind driven deflection of the glazing/IGU due to exposure to wind pressures at or near window design strength maximum capability.

- Research of the manufacture' s code and identifiers recorded established the windows to be series 2800 High Performance Horizontal Slider units manufactured by General Aluminum™ of Dallas Texas. General Aluminum is now a subsidiary of MI Windows and Doors.

## CONCLUSIONS

- In my opinion, the reported water leakage through the windows during Hurricane Florence occurred due to a design performance failure that resulted from sustained exposure to wind pressures at or near the window unit structural design capability during the storm. The elevated wind pressures acting on the glazing/IOU dislodged localized spans of the interior snap-on-type extruded vinyl glazing bead retaining the IGU within the sash frames, and created glazing panel deflections and clearances within the unit that exceeded the window design performance capability allowing water ingression to occur. The rate of ingress and accumulation of water into the sill exceeded the drainage capability of the sill weeps, causing water to overflow the stepped sill interior edge. This conclusion is supported by the following findings and observations: 1) the observations of the manager on duty during the storm of water ingress between the fixed and operating sash and overflowing the interior edge of the stepped sill, coincident with peak winds and inward panel deflections 2) the features and characteristics of the water damage patterns evident visually consistent in appearance with water ingress and accumulation between the fixed and operating sash and overflowing the interior edge of the stepped sill 3) the observations of interior snap-on-type extruded vinyl glazing bead retaining the panel within the sash to be compromised on multiple windows inspected, indicative of exposure to elevated wind pressure at or near structural design limit capability 4) storm data obtained for the Wilmington NC area established that the loss structure was likely exposed to approximate maximum sustained winds of 90 MPH, maximum gusts up to 105 MPH , and minimum ambient

7

pressure of 954 milli-bar (13.84 PSI) 5) research of applicable building code at the time of construction and review of the available architectural drawings for the loss structure established the basic design wind velocity specified was 110 MPH and 6) the lack of history of reported window leakage prior to the loss associated with Hurricane Florence."

14. Per public weather data, Hurricane Florence was accompanied by a deluge of wind-driven rain (likely in excess of three feet, in the area surrounding the Subject Hotel); and so, once the winds of Hurricane Florence created the above-described glazing/sealing damage to the Subject Hotel's windows, the amount of water thereby permitted to access and damage the interior of the Subject Hotel was massive indeed.

### The Subject Claim:

15. In the aftermath of Hurricane Florence, *Comfort Suites* retained *Universal Loss Consultants, LLC*, and its principal, Gregory Webb ("ULC" and "Webb"), to act as its licensed North Carolina public adjuster on its insurance claims with *Palomar* arising from Hurricane Florence.

16. Webb and ULC have since – after several walkthroughs with various of *Palomar*'s adjusters and building consultants, during which the massive scope of water-damage was unequivocally acknowledged by all – tendered to *Palomar* detailed, line-item-by-line-item *Xactimate* takeoff/estimates, assessing the total "replacement cost" ("RCV") to repair the damages to *Comfort Suites*' Subject Hotel resulting from Hurricane Florence at some $1,500,000.00.

### Wrongful Denial of the Subject Claim:

17. *Palomar*'s current claims representative on the Subject Claim, Brian King, has adjusted and otherwise concluded that the Subject Hotel's Hurricane Florence damages will require far less repair costs than claimed by the Insured, and further contends that *Palomar*'s $100,000.00 cap (or sublimit) on wind-driven-rain applies to and limits *Comfort Suites*' interior damage claim to only $100,000.00.

8

18. The operative policy's wind-driven rain language reads, in pertinent part, as follows: "[the *Wind-Driven-Rain* endorsement and sublimit] apply unless, "<u>[t]he building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain... enters...</u>" (See operative policy, CP 10 30 10 12, at its page 6 of 10, C. Limitations, 1.c. (1).... and, obviously, windows constitute a covered part of an insured structure's building-envelope/exterior-walls).

19. The North Carolina Court of Appeals has ruled (entirely consistently with the above-quoted endorsement language) that "[w]***ind-driven rain damage results solely from water being blown through pre-existing openings in the building. <u>Water damage resulting... from water entering a building due to openings created by the storm is typically covered under more traditional insurance policies and coverage does not require wind-driven rain insurance.</u>*** On Trading Corp. v. N.C. Ins. Underwriting Ass'n, No. COA08-669, 2009 N.C. App. LEXIS 296, at *5 (Ct. App. Apr. 7, 2009).

20. Mr. Stone's above-stated conclusions of wind-driven-rain notwithstanding, Mr. King and *Palomar* have elected to wrongfully rely upon the Subject Policy's inapplicable wind-driven-rain sublimit, and thus cap the INSURED/PLAINTIFF's Subject Claim for interior water damages at $100,000.00.

21. Even were the subject wind-driven-rain endorsement capable of an interpretation supporting its application to the Subject Claim (which it is not), "*insurance policies are contracts of adhesion, and <u>any ambiguity is to be construed strictly in favor of the insured and against the insurer</u>*," NC Farm Bureau v. Stox, (1992) 330 N.C. 697, and lineage.

22. *When an insurance company, in drafting its policy of insurance, uses a '<u>slippery</u>' word... <u>it is not the function of the court to sprinkle sand upon the ice by strict construction of the term</u>... If, in the application of this principle of construction, the limits of coverage slide across the slippery area and the company falls into a coverage somewhat more*

9

*extensive than it contemplated, the fault lies in its own selection of the words by which it chose to be bound... **In the construction of contracts, even more than in the construction of statutes, words which are used in common, daily, nontechnical speech, should, in the absence of evidence of a contrary intent, be given the meaning which they have for laymen in such daily usage, rather than a restrictive meaning which they may have acquired in legal usage**...* (emphasis added) Grant v. Emmco Ins. Co., 295 N.C. 39, 42-43 (N.C. 1978)

23. In closing the factual narrative component of this Complaint, it is noted that *Comfort Suites* has not yet completed or submitted their Contents/Personal Property or Loss-of-Income claims with *Palomar*. However, *Palomar* has made clear that both these components of *Comfort Suites'* Subject Claim are likewise subject to *Palomar*'s asserted wind-driven-rain sublimit; and so, *Palomar* has breached the Subject Policy with regard to both these facets of the Subject Claim as well, and both are likewise ripe for adjudication and the judicial remedies of specific performance and declaratory relief, per the INSURED/PLAINTIFF's prayer in the Complaint at Bar.

### PLAINTIFF'S FIRST CAUSE OF ACTION
### (BREACH OF POLICY/CONTRACT)

24. The INSURED/PLAINTIFF hereby realleges and incorporates by this reference as if fully set forth herein each and every allegation contained in the preceding paragraphs of this Complaint.

25. The INSURER/DEFENDANTS, *Palomar*, are contractually obligated to provide the Plaintiff with full coverage and reimbursement under the Subject Policy for their losses resulting from Hurricane Florence.

26. The INSURER/DEFENDANTS, *Palomar*, have, at all times relevant herein, refused to provide full coverage and reimbursement to the Insured, *Comfort Suites*, under the Subject Policy, for their losses resulting from Hurricane Florence.

27. The INSURER/DEFENDANTS, *Palomar*, are hence in material breach of the Subject Policy and have otherwise materially breached their contractual obligations to the Insured, *Comfort Suites*.

28. As a direct and proximate result of the above-referenced breach of policy by the INSURER/DEFENDANTS, *Palomar*, the Plaintiff has been deprived of much of the monies due it for the damages to the Subject Hotel and the contents of the Subject Hotel, and has suffered additional compensatory and other consequential damages, all to the Plaintiff's damages in an amount in excess of the $25,000.00 jurisdictional minimum of this Court, plus interest from the date of breach.

## PLAINTIFF'S SECOND CAUSE OF ACTION
## (BAD FAITH)

29. The INSURED/PLAINTIFF hereby realleges and incorporates by this reference as if fully set forth herein each and every allegation contained in the preceding paragraphs of this Complaint.

30. *Palomar* and its agents and employees have a statutory and common law duty of good faith and fair dealing to their insured.

31. This good faith duty includes, among other things, the duty to process claims submitted by the INSURED/PLAINTIFF under the Subject Policy in good faith, to evaluate coverage issues and policy exclusions regarding the Subject Policy in good faith and otherwise in a reasonable fashion and in compliance with contractual, statutory and common law, and the duty to refrain from, among other conduct, the following:

- not attempting in good faith to effectuate **prompt, fair and equitable settlements** of claims in which liability has become reasonably clear.

11

32. The above-alleged conduct of the INSURER/DEFENDANTS was in breach of their duty of good faith and fair dealing under the Subject Policy and North Carolina law, and, in fact, constitutes *per se* willful and intentional bad faith breaches of its covenants of good faith and fair dealing to the INSURED/PLAINTIFF, as it was an abuse of the power and authority which accompanied the INSURER/DEFENDANTS' superior bargaining position – relative to their insured – in the claim context, and is tantamount to outrageous conduct reflecting a reckless and wanton disregard of the INSURED/PLAINTIFF's rights under the Subject Policy and the detrimental financial consequences to the INSURED/PLAINTIFF resulting therefrom.

33. In point of fact, the INSURER/DEFENDANTS, *Palomar*'s insistence upon asserting their "wind-driven-rain" sublimit – as a cudgel with which to deny substantial amounts of the damages to *Comfort Suites*' Subject Hotel resulting from Hurricane Florence – is so devoid of factual or legal merit as to be patently unreasonable, to shock and offend the conscience, and to otherwise constitute malicious, willful and deliberate disregard of *Comfort Suites*' rights to good faith and fair dealing, as *Palomar* policy-holders.

34. The Plaintiff has been deprived of much of the monies due it for the loss of the Subject Hotel and the contents of the Subject Hotel, and has suffered additional compensatory and other consequential damages, all to the Plaintiff's damages in an amount in excess of the $25,000.00 jurisdictional minimum of this Court, plus interest from the date of breach.

35. Further, the INSURER/DEFENDANTS' above-alleged conduct was carried out in conscious disregard of the veritable certainty that such conduct would result in injury to the INSURED/PLAINTIFF, and with conscious disregard of the INSURED/PLAINTIFF's rights.

36. This conduct was on all occasions either directly engaged in or affirmed or ratified by the INSURER/DEFENDANTS' executive officers and/or directors, with full knowledge of the facts, and after a considerable lapse of time for investigation and reflection.

37. As a direct and proximate result of the above-referenced bad faith conduct by the INSURER/DEFENDANTS, *Palomar*, the Plaintiff has been deprived of much of the monies due it for the loss of the Subject Hotel and the contents of the Subject Hotel, and has suffered additional compensatory and other consequential damages, all to the Plaintiff's damages in an amount in excess of the $25,000.00 jurisdictional minimum of this Court, plus interest from the date of breach.

38. The INSURED/PLAINTIFF is also entitled to punitive damages.

### PLAINTIFFS' REQUEST FOR DECLARATORY RELIEF

39. Section 1-253 of the North Carolina General Statutes provides, in pertinent part: "Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree."

40. Section 1-254 of the North Carolina General Statutes continues, in pertinent part: "Any person… whose rights, status or other legal relations are affected by a… contract… may have determined any question of construction or validity arising under the… contract… and obtain a declaration of rights, status, or other legal relations thereunder.

41. Needless to say, the Plaintiff's "rights, status and other legal relations" with regard to the Subject Policy are "affected by" the above-referenced *wind-driven-rain* sublimit/cap and request is thus respectfully made that the Court construct and determine the validity of said

13

*wind-driven-rain* sublimit/cap and instruct the parties hereto that the *wind-driven-rain* sublimit/cap has no application to the facts at Bar.

**WHEREFORE**, the INSURED/PLAINTIFF prays judgment as follows:

1. For a trial by jury;

2. For a declaratory ruling – pursuant to Rule 57 of the North Carolina Rules of Civil Procedure, *et seq.* – that *Palomar*'s asserted wind-driven-rain sublimit/cap has no application to the facts at Bar;

3. That *Palomar* thus be ordered to specifically perform its full coverage duties under the Subject Policy, by paying all covered aspects of the INSURED/PLAINTIFF's claimed damages arising and proximately resulting from Hurricane Florence;

4. For all of their contractual and other incidental and consequential compensatory damages in an amount according to proof;

5. For punitive damages in an amount according to proof;

6. For attorney's fees and costs of suit incurred herein, according to proof;

7. For interest according to proof; and

8. For all such other and further relief as the Court may deem just and proper.

Respectfully submitted, this the 5th day of December, 2019.

**The Law Office of Michael Davenport, P.C.**

_____
Michael S. Davenport
State Bar No.: 23956
Attorney for the Plaintiff
2505 South College Road
Wilmington, North Carolina 28412
Phone: 910-362-9500
Fax: 910-799-8496
Email: msd@mdavenportlaw.com
http://www.mdavenportlaw.com

_____
Gregory R. Simons
State Bar No.: 52531
Attorney for the Plaintiff
2505 South College Road
Wilmington, North Carolina 28412
Phone: (910) 798-5900
Fax: (910) 799-8496
Email: Greg@overholtlaw.com